Case number 15-5008, Samuel Ortiz-Diaz, Appellant v. United States Department of Housing and Urban Development, Office Inspector General Ms. Gaines for the Appellant, Mr. Schwabe for the Appellate Ms. Gaines, good morning. Good morning, Your Honors, and may it please the Court, I'd like to reserve four minutes for rebuttal time. My name is Eden Brown Gaines, and my client behind me is Samuel Ortiz-Diaz. And I'm introducing him because it's important that the Court know that Mr. Ortiz has dedicated his adult life to the service of this nation and the enforcement of its laws. And he went to the District Court asking that the District Court enforce Title VII on his behalf. Imagine, Your Honors, that there is a water cooler in the office environment, and above the water cooler is a sign that reads, Whites Only. A water cooler is a benefit that we all can agree is not required for the employer to provide. It's simply a benefit, something that helps the employees get through their day. A benefit that we all should agree cannot be doled out in a discriminatory fashion. We can agree that there actually should be no Whites Only sign above the water cooler in the employment environment. It is unlawful. Unlawful even though not a penny is lost by any worker. Unlawful even though no one lost control of a major budget. No one lost supervisory duties. Unlawful even though it's a benefit that is not in any way related to the actual workplace. Although presumably backed up by a constitutional provision. I'm sorry, Your Honor, I can't hear you. Although presumably backed up by a constitutional claim. It's unlawful because Title VII says that, plain and simple, there cannot be any discrimination in the workplace. And you can't discriminate based on race, and in this case race and national origin. But I think if the district court opinion stands, employers will be free to place Whites Only signs over benefits and privileges of employment. Any benefit and privilege of employment. And that is not within the meaning of Title VII. And I think for the court, that should be something that is untenable. There are three issues in this case, Your Honor, before the court. The first is whether participation in HUD-OIG's voluntary no-cost transfer program constitutes an adverse action within the meaning of Title VII. And the district court said it doesn't, but clearly the denial of that benefit does constitute a violation because it is an adverse action under the law of this circuit. Well, what's your strongest case? The strongest? In this circuit. Well, there's several cases in this circuit. We cited two, Stewart v. Ashcroft, Brown v. Brody. And it's not in our brief, but also a similar issue came up in Schakowsky v. Peters. What I'm getting at is this circuit has a fairly high bar for what constitutes an adverse action. And it's not enough that in your hypothetical you don't want the sign over the water cooler. You have to show that something concrete happened. And as I read your papers, the strongest statement that you have, because the district court said you simply didn't present evidence of these adverse consequences, is the effect on your client's career path. That's paragraph 12 of plaintiff's declaration. So the argument here is that, one, using your water cooler analogy, that anybody could drink water from the fountain. And only minorities were being prevented. As you're arguing here, as I understand your case, you think that's enough for Title VII. But our cases in Brown v. Brody, and then we backed off a little bit on that, but we've had cases where people have shown they didn't get a promotion, they didn't get a bonus, that type of thing. I mean, it's concrete. And the most concrete thing I could find was paragraph 12. Is there anything more? There's two things, Your Honor, and I think one speaks to exactly what you're saying, and the other speaks to the improper whittling down of what Title VII's remedial purposes really are to be. So addressing your argument first, yes, I mean, this court has said clearly, if there is a denial of a benefit that impacts some materially adverse consequence, it's like your pay, your leave, your job responsibilities. But not just pay or leave. It's a benefit. And as you're noting – I understand your argument about whittling down Title VII, but this panel certainly has to apply the law of this circuit. And we have required these concrete harms. That's right. And there's two points with respect to the law of this circuit. It's, one, what you've pointed out, Mr. Ortiz did produce evidence that showed materially adverse impact. What? He was going to move to Region I or II where the work was more high profile. The court in Stewart v. Ashcroft talked about future opportunities, not just something that's happening in the present, but future opportunities. And that idea is that I'm trying to make a move, I'm doing something that's going to give me the opportunity to be promoted, to gain the skills and experience that's going to enhance my career in a way that may have some pecuniary result. And so Mr. Ortiz produced evidence which clearly indicated that the regions that he was trying to move to, Region I and II, were more sophisticated. And where is that evidence? That is in the affidavit that was noted there, also in his testimony. So he's saying clearly that there is an issue here about future opportunities. He also brought up the point about wanting to get away from the discriminatory decision maker. The agency says that that is speculative, but indeed it wasn't speculative. We're talking about a decision maker who probably had more complaints against him for discrimination than there are cherry blossoms around the tidal basin. But he promoted your client. He actually promoted my client when he was the only candidate who had applied for the position. And so when he moved to the GS-14 position in Washington, D.C., no one else wanted the job. No one else wanted to work there. So you could call it a promotion, but it was actually just the fact that there was nobody else who was interested. He was getting more money for the work he was doing. He was, but you have to understand the culture of HUD-OIG, Your Honor. Well, that's my point. Where is that evidence? That brings me to the second point. I think there is evidence in the record that he's put forward that says that it impacted his future opportunities, but there was a motion to compel that was pending. And Mr. Ortiz was seeking evidence. Now, the district court denied the motion to compel, claiming that there's no evidence that was being requested that could have helped Mr. Ortiz because he was finding that there was no adverse action. But that, in fact, was not correct. Part of the subject of the motion to compel were what are called peer review reports, and within those reports there would have been evidence to have suggested the nature of the work. It would have made it clear for the court and perhaps a jury or a fact finder why it was important for Mr. Ortiz to be able to move to this region. There was some testimony in the record from Rene Febles, who was what they call the SAC, the special agent in charge over Region 2, who was actually looking or seeking for an extra agent in Region 2 because of the nature of the work and the need to have someone who was more senior level or high level actually come and perform there. So what we didn't get, these peer review reports, would have given the court examples of what exactly was needed, the kind of work that was needed, where the agency was faltering by not perhaps having this individual there, but that's discovery that we never got. And it wouldn't be appropriate to deny the appellant the opportunity to get to a jury when the district court and the government purposely blocked their access to the kind of material and information that would support their claim. When I speak to the whittling down of Title VII, I'm actually not speaking to the concept that if you can prove that there's a materially adverse or significant impact on future opportunities, then you can get to a jury. I'm actually speaking to the very beginning, just the basics of Title VII and its remedial purposes. And Title VII is clearly designed to extirpate discrimination from the workplace. And so here we have a scenario. If we're going to say that, hey, there's nothing here, there's nothing adverse, there's nothing that actually happened to him in the denial of this transfer, you're creating a scenario where an employer can say, we're going to have a benefit, we're going to create a benefit, and we can dole out this benefit so long as there's no pecuniary loss, so long as. So the peer review report, you say, would talk about the nature of the work in Region I or II? That is the expectation. I never actually saw all of them, but my understanding from my client is that it shows what's wrong. It shows what's going on in the region, and it shows where they're faltering. The idea at that time was that Mr. Febles was looking for another agent to fit into that region because of the nature of the work that needed to be performed in that region. The same can be said, he was also seeking to go to Region I, and the peer reviews may have demonstrated in Region I that there was an actual need for the work. So in your motion to compel, does it proffer to the district court that this type of evidence would demonstrate how his career, his future opportunities? The motion to compel just simply indicated the types of evidence that we were looking for. It indicated that he had not gotten peer review reports. There were other evidence that also wasn't provided, so it kind of listed all of them. But you've read the district court's opinion. Yes. And it's saying, as I read it, there weren't these proffers. The district court's opinion said that because the district court is finding that there wasn't an adverse action, there's nothing about what was in the motion to compel that would help Mr. Ortiz. And why is that incorrect? It's incorrect because there was plenty of evidence that Mr. Ortiz was seeking in the motion to compel that would have assisted him. And did the motion to compel make that clear to the district court? The motion to compel gave reasons for why all of the evidence was needed and why it was probative of the discrimination that he was trying to prove. I mean, it's clear he wants to move. It's clear he doesn't like his supervisor. It's clear he doesn't think he's being treated fairly, all right, on the basis of his race. And the district court says that's not enough, just your personal feelings. I need hard evidence that your pay is affected, your future opportunities are adversely affected. Well, interestingly enough, Your Honor, the district court said two things. So it was also clear that white individuals were allowed this benefit and privilege at a whim, and Mr. Ortiz is the only person in the record who wasn't granted this privilege. But in the motion to dismiss, I'm sorry, Your Honor. Go ahead. Okay, in the district court's motion to dismiss, which is also published, the district court said that allegations that an employee was denied a transfer which impacted career opportunities easily satisfied the standard. That was in the district court's opinion, denying the government's motion to dismiss. What about the specific facts here of Albany and Hartford and the government's alternative argument for affirmance here is that even assuming there's an adverse employment action, they proffered legitimate non-discriminatory reason for what happened here and there wasn't sufficient evidence shown to undermine that. I think that's not true. I think there is sufficient evidence in the record that shows that the decision-makers' reasons are not worthy of credence. The decision-makers advanced two reasons. One, they said that there was no office in Albany. And Mr. Ortiz proffered evidence that showed that these investigators, they work with law enforcement, sometimes the U.S. Attorney's Office, sometimes the local police. They didn't actually need to be housed in a HUD-OIG office that housed an investigations aspect of the line of business. He gave examples of offices, Billings, Montana, that weren't actual brick-and-mortar offices for HUD-OIG investigators, and yet officers were working out of those offices. We gave evidence that Mr. Febles had told Mr. Febles... But that's different from the transfers of the similarly situated white officers where there was a need in the other offices for them. At least that's what the government says. Can you respond to that? Yes, sir. The evidence in the record is not that there was a need for these transfers when white people transferred. The evidence in the record is that, hey, I want to move because my husband lives in Boston. Can I move there? I want to move because I don't like Grand Rapids, Michigan. Can I move to Texas? That's the evidence in the record. There's actually no evidence that the government proffered which suggested there was a need for any of the numerous white officers who were allowed this benefit to transfer. The second aspect of your first question, Your Honor, was also that the Hartford position was no longer available. And the evidence in the record was that the position, there was a white special agent who'd asked to move to Boston because she wanted to live with her husband. She vacated the position that Mr. Ortiz was seeking the transfer to. When he asked for it, Mr. McCarty said, oh, it was a mistake, we weren't supposed to put it out. But there's actually evidence in the record where he's sending an e-mail to his deputy saying, send out this announcement. They said that was a mistake. That could be, you may disbelieve that, but what's the evidence in the record to show that it wasn't a mistake? I think there's evidence that a fact finder could find Mr. McCarty not credible because he claimed in his deposition when I first asked him that it was a mistake, I knew it was a mistake, I never intended to do it. He didn't know I had that e-mail where he's actually asking for this person to send this announcement out. And he couldn't explain why he later asked that individual to send the announcement out. The other aspect of it is that when Mr. Ortiz, the Hispanic individual, asked for it, he said no. But a couple of months later, another white special agent from South Carolina asked to go to that position, and that was granted over the objection of the special agent in charge over that region. He said she was actually needed in the region and she couldn't go. And Mr. McCarty overruled that fact and sent that white agent into the very position that he says wasn't available and that nobody could work. So I think that's sufficient evidence for a jury to find that his reasons for denying the transfer are not worthy of credence. I think also with respect to the motion to compel, we were also seeking evidence on the way the offices were set up. They had given us the picture of offices as of May 2011, and mind you, these things were going on in the fall of 2010. So we were seeking information about what the office picture looked like, where people were working at that time, and they refused to give us that evidence. And so we were also seeking in the motion to compel to have the evidence to kind of bolster that claim that there were many agents who were working in different offices at the time and not necessarily tethered to an office that showed investigations. I mean, I think all in all, what was confusing for me is that the district court seemed to be on the right track in denying the motion to dismiss, and then there was some inexplicable change in the standards, so to speak. I think this case meets the standards. On the adverse employment action. Yes, sir. Yes, sir. And what we also haven't talked about is the Supreme Court's case in Heeshawn v. Spaulding, I mean, which says it, I think, best. In that case, the court made clear that when there is a benefit, and I don't think there's any denial that this voluntary no-cost transfer program, which was actually an organized program, it wasn't ad hoc decisions made to move people around, although for white individuals it tended to work that way. There was an actual program that was a benefit to offset this mobility clause, to move people around so that they could get the kind of experience that they needed. And in Heeshawn v. King and Spaulding, the Supreme Court clearly said that you cannot dole out a benefit in a manner that is discriminatory. And I think inherent in that discussion, inherent in that decision, is the idea that even if there's no loss of pay, even if there's no loss of supervisory duties, even if you don't lose your budget like in Chekowsky v. Peters, there can still be an adverse action because we're not going to allow employers to give benefits only to individuals based on protected classes. And that's exactly what is happening here at HUD-OIG. You have a discriminatory decision-maker saying that only whites can drink at the water fountain, only whites can participate in this program, and that is not what Title VII allows. Title VII says that's not okay. Let me stop you if there are no more questions because you're out of time. We'll give you a couple minutes to reply. Sure. Thank you. Mr. Shoiby. May it please the Court. Mr. Ortiz has provided no evidence that being denied his request to move to a location closer to his wife because of his own personal preference to a position that would have resulted in a demotion from a senior special agent, supervisory special agent position at a GS-14 to a GS-13 position outside of headquarters rises to the level of what this Court has repeatedly found to be the necessities, the requirements for an adverse employment action. Was the demotion true as to the Hartford position? I'm sorry, Your Honor. Was the demotion true as to the Hartford position? I believe it was. For both positions, Your Honor, he was a GS-14, and I believe it was in the record that moving to another position, he would have had to take the demotion down to a GS-13. So neither of those, that didn't enter into the reasons given? That didn't enter into the reasons given? Two reasons were given. He couldn't transfer to Albany because there was no office. That was the primary reason, yes. All right. But there's all this evidence you don't need in office. I'm sorry. The key, Your Honor, is in the program itself. The no-cost transfer program strictly says employees will be considered, this is on the Joint Appendix page 245, employees will be considered for each geographic location identified as vacancies become available. There was no vacancy in Albany. There was no vacancy in Hartford. But the response is that there's disputes about that, on Albany, that you didn't have to, you could be assigned to an office, another existing office with Hartford, that someone was assigned there the following year, I think, and so that a jury from that evidence could reasonably conclude that there was something of a vacancy. Now, maybe in the end they wouldn't believe that, but that they could at least go through that evidence and figure it out. Two points, Your Honor. The first point, and this really is the primary point here, this is under no circumstances an adverse employment action. Okay, first, before I get into the facts of this transfer. But even when you get into the facts of the transfer to Hartford, you'll see that the transfer to Hartford, this position was not available until after Mr. Ortiz had even left the agency. The departure of Michelle Jackson from Boston, the movement of Jessica. But you have the email that goes out, and then you have, okay, that's a mistake, and then you have six months later someone filling a spot in Hartford. Right? Isn't that the terminology? Well, that was because Jackson left Boston subsequently. I mean, these are separate events. The email went out. The email was a mistake. And remember, Ortiz didn't apply for this position even after it went out and it was a mistake. He didn't express an interest in going to Hartford until October, until much later, at which point, well after that mistake had been acknowledged. Now, it wasn't officially withdrawn. It wasn't a policy to withdraw. But don't you understand how someone could think, okay, there's an email that goes out saying there's a vacancy. And then when you press them on it, they say that's a mistake, and then the next year they actually do fill a spot there. Don't you think that's enough for a jury to think something's afoot? Your Honor, I don't think it is because the facts, as in this record, indicate that that position, again, was not even open and available until after Ortiz left. But, again, we have to go to the primary point here. I mean, I can get into the weeds on these arguments, and I think the government prevails in all of them. But I think that the primary argument here is there is no way this is an adverse employment action. It doesn't rise to the level. Appellant relies on the Hishon case. The Hishon case deals with consideration for partnership in a law firm. Okay? An attorney enters practice, goes to a law firm. So his argument is he's trying to get experience in the field that will enhance his experience and enable him to obtain advancement in the future. The record is replete with evidence that the reason Mr. Ortiz wanted to move is because he wanted to be close to his wife. Could have more than one reason. It still doesn't fall into any possible case law that says this is an adverse employment action. No, no, no. We've got this declaration where he suggests that being in headquarters is a dead end. Ignore the discrimination aspects of it. You've got to get out in the field where you get involved in these interesting and challenging, sophisticated, sensational investigations. So he wants to get out there. And he wants to get out there to enhance his future opportunities. And he wants to be near Albany as opposed to Spokane, Washington. And he does this approximately six months after the person who supposedly is discriminated against him, Mr. McCarty, places him in this position, this supervisory position at headquarters, a GS-14, for the advancement of his career. But do you understand what we're getting at? Excuse me. His perception is headquarters is sort of the dead end. He's willing to take a demotion to get out into the field, a demotion in pay, because he wants his experience. Well, you know, I think Mr. Ortiz wants to have his cake and eat it too. He moved to Washington specifically for the purpose of advancing his career. He made an agreement that he would be in that position from December 09 to December 10. He goes there. He's a supervisor. He's got a supervisory position. He's in headquarters. He's a 14. He's got an increase in pay, increase in a lot of things in terms of career. And then six months later he says, you know, I want to get out of here. I want to be closer to my wife. I mean, I don't think that it is. No, he says, I want to get out in the field to get this experience that will enhance my future opportunities. Well, the word speculative comes to mind, Your Honor. I mean, what he is saying, if he's trying to turn that into an adversary. And that's what I want to understand. Is the government taking issue with his basic thesis that infield experience is valuable for people who are seeking to advance within the organization? I didn't see that in your brief. I don't think we need to go there. No, but, I mean, you're not taking that position either. In other words, you're not saying that his desire is wholly a figment of his imagination. I'm saying that his desire that moving from a – and I'm sorry to repeat this again, but I think it is relevant – that his desire to move from a supervisory position out of headquarters to lower pay is going to somehow better his career is the definition of speculative. I mean, he may believe it, but that doesn't mean that it's anything that should be considered in terms of deciding the refusal to move him as an adversary. Well, we can all cite examples of a lot of people who didn't get what they wanted and went on to do something else that looked like it was a step backward, and they advanced subsequently. So that's not irrational. It's not irrational, but we can't say that it's an adverse action not to. Remember, what the court also pointed out was it was a request to be transferred. He got the request to be transferred. I know your idea is it's just an opportunity to submit a request. It's an opportunity to submit a request. He got that opportunity to submit a request, and he hasn't provided it. But even if we buy into his theory that it was the transfer that was promised, he didn't fulfill the terms of the transfer under the policy because there was no position available. And there were no guarantees that he would get it. That's not to the adverse action part of the case. That's to the non-discriminatory explanation part of the case. That was my point earlier, but I think you're answering a different thing sometimes. On the adverse action, if you perceive this as helping your career, to follow up on Judge Rogers' question, and you're denied it, because of your race, why is that not an adverse action? Just the common sense of the term. Because I think the case law doesn't support that type of speculative belief as being supportive of an adverse action. There has to be some type of either concrete loss in payer benefits, something that's tangible. I think the word that's used is tangible. Stuart v. Ashcroft talked about the structure of the organization as being relevant to it, and said, you know, we've drawn a line. While generally lateral transfers or the denial of them could not be considered adverse employment actions, there are circumstances where they could be. And so that's where we are. We're in the case. We don't have an absolute rule about a lateral transfer as well as you prevail. Stuart's a great example. Because there, there was something tangible. Here's a person who's moving to become supervisory senior litigation counsel. That's something tangibly superior. It may affect his future career ability. It'll affect his prestige. It'll affect his employability in the future, that type of thing. But that has nothing at all to do with saying I want to move out of a supervisory position that I have agreed to stay in for a year. I think that's, to me, that's an important point. Because he says I'm going to do this job for a year. I'm going to take the 14, I'm going to supervise her. Six months into it, he says I want to leave. And there's nothing about the position that he's going to that has the indicia of being better like a senior litigation counsel did in Stuart. I mean, I think that's a very clear distinction. But if, I guess it's, the subjectivity makes this hard because you use a legal analogy. If you're a main justice and you want to transfer, you want to be a judge someday and you want to transfer to a local U.S. attorney's office and it's lower pay but you think it will help your chances of being a judge and you're denied it because you're African American, you're saying you're out of luck. Well, I think that if we look, if we're going to go by the case law in this circuit, it remains speculative. I think it just has to be speculative. Anybody can say I want to do this, I want to do that because I think it's going to help me. And every single time it's a jury question. The circuit has been clear. It has to be a loss in something tangible. It has to be pay. It has to be some type of tangible. It has to be objectively tangible. You haven't left out the word objectively. And I appreciate that, Your Honor. Objectively tangible. And there is nothing like that here. What about the lack of discovery? Well, you know, I think Judge Lambert, the district court rather, I think the district court perceived from what was going on here, there was a tremendous amount of discovery in this case. I mean, everything that could have been given to the plaintiff was given. And I don't want to bore the court with going through all this. Give me some examples. Some relevant examples. Relevant examples. 2,000-plus pages of documents. Three disks. Oh, no, no, no, no, no. Not volume. Okay. Content. Content. All the available information regarding who was transferred, what their GS level was, where it was available, what their race was. Part of the problem here is that a lot of this information was not kept. But everything that was kept was turned over. And it wasn't kept because of the records disposal process? I believe that's correct. Well, I'm just asking it. Not only the records disposal process, but also it just wasn't, it was not something that was compiled in that fashion. So who gets the benefit of that? Well, again, I think it goes back to, I focus on, because I did the discovery in this case, I know that discovery was tremendously burdensome, and we gave it to them anyway. But that still avoids the problem. You keep telling me about burdens on the government. You talk about the volume. I want to know the content so that the district court could be satisfied that this plaintiff could not show an adverse action, a tangible, objectively tangible. Objectively tangible. The information that you requested regarding transfers was provided. The information regarding... So is the rule following up on Judge Kavanaugh's example that the denial of the transfer in his example necessarily as a matter of law could not be an adverse action? The denial of the transfer where there is no, under the law of this circuit, lessening of pay, of benefits. So even if it's a dead-end job, you're pushing papers, you're preparing the budget, you're doing administrative stuff. And in order to be advanced in this position, what you need is to be out in the field and getting that type of experience. And does all of this turn on the fact that in order to get that experience that has the potential for future advancement, if you accept a reduction in pay, it necessarily as a matter of law cannot be an adverse action? Not unless you can point to some other tangible, objectively tangible evidence showing that it would somehow be. And that's why I pointed out the government is not taking issue with his premise that field work is what gets you advanced in this organization, not sitting in headquarters. I'm not objectively taking exception to that. What I am taking exception to is just because I say it's the case, it's so. But just because I think it's the case, it's so. And that's, I think, why the circuit has emphasized this objectively tangible standard. You can't have people just saying, oh, I should have gotten this, I should have gotten that, because it's my belief that it would have helped me somehow. I mean, there has to be something beyond that. What would a plaintiff have to proffer? To show that going to a lesser pain. Take Judge Tavanaugh's example, that every judge on the federal bench has at some point in his or her career been an assistant U.S. attorney. Would he have to come in with evidence to show that people who have advanced in the agency have always had field, in-field experience? I think that, I don't want to concede that that type of proffer would necessarily get you there, but I think you certainly would have to do something. I can't see considering it unless there was something like that, that moving out. Well, if the government isn't challenging the premise, that's what I'm getting at. What's the evidence he has to offer? I think it would have to be something that would fit into the definition of something that would better the terms, conditions, privilege of employment, or future employment opportunities. Future employment opportunities, that's what we're focusing on. A proffer is something that would say people that move out into the field generally do become promoted at a better rate than people who are stuck in headquarters getting paid more money in a supervisory position. How would he get that information? I gather from your answers here that that was not part of discovery. It was everything that was requested and available to the government was provided in discovery in this case. So are you saying the motion to compel was asking for things that didn't exist? I would say the motion to compel, everything was already provided in terms of what the motion to compel... Well, counsel represented that the peer reviews were not turned over, as I understood her argument. And I think that Judge Lambert correctly stated that the information sought, including the peer review, could not come up with information that would have somehow turned this transfer into an adverse employment action. This refusal to transfer somebody into a non-guaranteed position. Can we go back to that point as well? There was no position available, and the policy specifically said there are no guarantees. I think it might even have it in caps. It says there are no guarantees and... But I thought the plaintiff proffered that the history of these transfers showed that positions were created when these requests came in. So the fact of a pre-existing vacancy wasn't necessarily determinative. Well, it was determined... The only circumstances in which it was not was one was a demotion, and the other, I believe, was not even something that was... So much of the appellant's argument is based on the actions of Mr. McCarty. Mr. McCarty wasn't even involved in the other transfer, which I believe was pursuant to a settlement agreement. The problem here is our case law had what arguably was a fairly bright line, right? And Brody and then Stewart. I mean, you could argue that, but in any event, it's not so bright after Stewart, right? Judge Henderson had a concurrence in the judgment. Stewart talked about that. And now we're stuck with trying to figure out whether the, quote, circumstances of the case make it adverse or not. And this is more our problem than yours. I'm just commenting that it's very challenging because if you tell someone, if someone applies for a lateral transfer and they're denied, they feel like it's an adverse action, understandably. Objectively, everyone would feel like, I wanted that, and I'm denied that, and you want it for a reason, because you think it's better for your career or your personal situation or whatever. Look at the best case that the appellant came up with. I mean, this is the end of the day. The section's entitled. Hyshon is the case we have to look at. Look at how different Hyshon is. I understand that. I'm just talking about the real world and common sense, which is you apply for a job, a transfer within your organization because you think it's a better situation for you. That's why you do it, right? That's why we all do it. And if you don't get it, it seems adverse. It seems like an adverse action. And if someone tells you you didn't get it because you're African American, that really seems problematic. But this is our— But these are promotions. I feel like I've gotten away from the framework here. These are all dealing with promotions. Even appellant in her brief called Hyshon a promotion case. This isn't a promotion. This is a request to be transferred for the benefit of the agency. I understand that, but our case law doesn't draw a bright line that once arguably appeared about lateral transfers just being out altogether. You can't challenge a lateral transfer, the denial of a lateral transfer. That arguably appeared in some earlier cases, but no longer is the bright line. And when it's not the bright line, it becomes very challenging for me to figure out how to draw that line. Now, you have a whole second argument that is the fact-specific argument that there really was no discrimination here sufficient to get to the student jury, and I take that argument. The adverse action part of the case I find very challenging because I don't think our law is very clear, but I'm not sure it can be very clear unless we just say— Our law as it stands— Unless we just say all lateral transfers are adverse actions or all lateral transfers are not adverse actions, it's going to be hard to figure out which ones are and which ones are not. If we look at the law, though, the circuit, though, if we look at Stewart, it has to be something. I mean, Stewart talks about a senior position, a transfer to senior position. I think we are really—it's going to be, like you said, it's going to be very problematic if it becomes— it's my opinion that it's going to better my career to go here, but there's no way to objectively determine that. And I think recognizing that— There's no way to objectively disprove that either. Exactly. Well, that's the problem, I suppose, is that it's hard to say that's— Oh, you're wrong. Actually, going out into the field is going to harm—is no different for your career. You say, actually, I think it's going to improve my career prospects, and how do we know? Yeah. And that's the problem. I mean, a bright line one way or the other would help us, but obviously I think that would be problematic too, and Stewart does not have a bright line. But again, this case is not—I know you acknowledge what I just said, but I'm going to say it again because I think it's important, and that is that when you're talking about adverse action, it has to be something more substantive than a—something in the agency where it says, we can involuntarily move you wherever we want to move you. We'll pay your expenses for our benefit. What about the work? And for our benefit as well, we can—we'll allow you to apply if there's a position available to go someplace. So you get—we get people who want to be in certain places for our benefit, but to bring that up to the level of this is—I was denied this and this is an adverse action, it doesn't rise to that level. It's not even close to what the situation was in High Shot. What about the water fountain hypothetical? I'm sorry? What about the water fountain hypothetical? The water fountain hypothetical is a—well, I think there's all kinds of things attached to the water fountain hypothetical. I mean, as Judge Rogers points out, there's constitutional protections there, but as well, I believe that—there's an example. If you're denied an opportunity to go to a water fountain because of your race, there are all kinds of issues with being demeaned, with placing somebody else above you, with the type of things that— But what if you're denied lateral transfers because of your race? Okay, all the white people can laterally transfer, but no one else. And under your theory of the case, that's not an adverse action. You could have an explicit policy that said that, and under your theory you'd say, that's right, that's not an adverse action. You have an alternative argument in this case. I understand that, so I'm not—you know, I understand. But I'm just saying your theory of the case goes very broadly into some hypotheticals that would be very problematic, which counsels rightly pointed out. Right, which I think goes back to the fact that there has to be some way to objectively determine what, in fact, is an adverse action. And I think the circuit has done that. And I think the appellant is trying to squeeze something in here that I— her own arguments where she focuses on a non-promotion case as the best example is not analogous. So could I just hone in a little here? If there had been a proffer of testimony by— and I can't remember the name of the man who was in charge of the Albany office. Let's just call him Mr. Jones. And if Mr. Jones— Fables, I think. Excuse me? Was it Fables? I think it was— Well, you know who I'm referring to. Okay, yeah, I do. If there had been an affidavit from him along the lines of saying that coming here would afford the plaintiff the type of experience he needs if he's going to move up in this organization, would that be enough? In other words, I suppose part of the argument here is all we have— and I'll ask counsel for appellant here— all we have is the plaintiff's declaration. The plaintiff's speculation. Declaration. I'm sorry. Declaration under oath. Mm-hmm. I think if something like that existed, I think it would certainly support the speculation that it might somehow better his career prospects. I don't think it takes something like a request to transfer under a policy that is meant to benefit the agency and turn that into something that can be grounds for an adverse employment action, the denial of which can be grounds for an adverse employment action. It's just not the type of substantive change. There was no change here. He was denied an opportunity to go someplace because there were no available positions out there, and it wouldn't have—and that's that. Every other adverse action case talks about some kind of change. There's no change here. And if you look at the Medina case, which was decided by the circuit, there somebody was forcibly transferred to another location, and the court found that's not an adverse action. If a forcible transfer is not an adverse action, how can a refusal to transfer out of— and I keep going back to this because I can't stop thinking about it—a GS-14 supervisory position. He got what he needed to advance his career. You just can't accept the reality that for some people money isn't everything. I understand that, too, but he did make an agreement to be there for a year, and the record is replete with him saying, you know, I want to go back to my wife, which is a personal preference which the court has said should not be considered in an adverse action case. All right. Thank you. Okay, thank you. Does Ms. Gaines have any time? All right, why don't you take two minutes? Just quickly, Your Honors, let me just point out a misstatement of the record. Mr. Ortiz was not in a supervisory position in CID, and there is evidence in the record that he wouldn't have had to have taken a demotion. He proffered evidence of several white investigators who had been in headquarters and moved out to the field who actually retained their grades as GS-14s, and then he gave evidence of also a GS-15 who retained the position. So it wasn't even about money in that sense. He would not have been taking a demotion to go back. It would not have been necessary for him to do so. I think what Judge Kavanaugh pointed out is very important about the state of the law here, and I think this case presents an opportunity to give some clarification in the context of an adverse action. I think what this court has said pretty clearly is that you have to look at the circumstances of the case. There is a general rule, and the rule is that sometimes a purely lateral transfer can be an adverse action, but we have to look a little closer at the facts or the circumstances in order to make that determination. And this case presents an opportunity for this court to actually do that in a context. And I think this court should certainly be guided by the basic principles of Title VII. As pointed out, as I stated, Title VII isn't about giving benefits to people because of their race or denying benefits to people because of their race. If the court just goes back to the basics and takes the opportunity to clarify here, the decision has to be that we're not going to allow a circumstance where a benefit of employment, even if it was a purely lateral transfer, can be meted out in a discriminatory fashion. The challenge is, I think, if we accept your position, it's going to be hard to ever say that a denial of a lateral transfer is not an adverse employment action. I don't think that's a problem when there is evidence in the record that something is given to people based on race. That can never be okay. So you're saying it's not a problem that all denials of lateral transfers could be adverse employment actions? I'm saying any time there's evidence that there's a benefit of employment in the workplace that was given exclusively to people because of their race or where they were born or their religion or any, you know, or if you're denied that benefit because of an immutable characteristic, that is never okay. And perhaps, you know, as the law has evolved, there was this thought that, you know, discrimination issues were better in the workplace, the courts don't need to be as vigilant. I think anybody who's watching Trump's rise knows that that's not true in this country. And this is the court's chance to restate that we're sticking to the principles of Title VII and we're not going to allow discrimination in the workplace, period. I think in this case it fits within Stewart v. Ashcroft because there is, as Judge Rogers pointed out, evidence that there would have been something for his career, there was a benefit. And it's important to note that his affidavit is undisputed. The plaintiff can give testimony to his own benefit and the government offered no testimony that disputed that. I think if I look closer to the record, I could also tell you that his very first- You're out of time. Okay. I have one question, though. Sure. What about the government's alternative argument? Insufficient, assume that you get over the first hurdle. What about the second hurdle? Insufficient evidence to get to the jury. I think that's just absolutely not true. As discussed before, I think there's plenty of evidence for a jury to find that the discriminatory reasons for not transferring him, that there was no office in Albany and that there was no vacancy, is not true. In the record it shows that- That there's enough evidence in the record to show that the reasons given were pretextual. Oh, absolutely, absolutely. Well, is that your argument? Yes, ma'am, yes, ma'am. Special Agent Michaela Jackson asked to leave Hartford. There is a memo in the record from Diane Deshellis, who was the supervisor, asking to replace Ms. Jackson. The court should note that when Ms. Jackson left, there was no evidence that she was leaving for a vacancy in Boston. She was just asking to go there because she wanted to get married. In fact, all of the white individuals who transferred, there's no evidence in the record that suggests there was actually a vacancy when they transferred. In fact, there probably wasn't. But here, Diane Deshellis asked to replace her. Mr. McCarty said, sure. He sent out an announcement saying that she should be replaced. It was only a problem when Ms. Ortiz asked for it. And then when he left, it was no longer a problem, and a white special agent took the job. Again, in discovery, we were precluded from getting evidence to show that there were lots of offices that weren't investigation offices but housed investigators. But there was sufficient evidence in the record, even with that discovery shortfall, to show that Ms. Ortiz is correct. There's Rene Febles' memo saying that he wanted another investigator. He testified actually at his deposition saying that he could have worked from his home or that he could have worked for some office. And then there's plenty of evidence showing that other white special agents actually did that, that they didn't necessarily work in offices that were assigned to HUD investigations. What's the evidence you were precluded from obtaining in discovery? I've got a little list. There was the evidence of the peer reviews across the offices in Region 1 and 2, just to clarify that there would have been several peer reviews for that region. There was evidence concerning the makeup of the offices at the time. We got May 2011, but Mr. Ortiz was proving these points for 2010. They didn't give us any evidence about the makeup of the office in 2011. There was also the informal nature of the transfer request. Mr. Schwabe said that they gave over everything about transfers. Nothing could be further from the truth. In fact, I had to pull out evidence about who transferred from just a chart that I had about where people were in different periods of time. They gave me no evidence of approvals. There were e-mail chains that said, may I transfer? And Mr. McCarty would say, yes. None of that evidence was turned over, and there appears that there was a plethora of that kind of evidence. And so I picked out the main things that were the most important. There were a lot of things that I put in the motion to compel that would have been helpful but weren't the most probative things. You're out of time. Okay. Thank you, Your Honor.
judges: Henderson, Rogers, Kavanaugh